2003 OK 1

**In the Matter of the GUARDIANSHIP OF A.G.S., a Minor Child.**

**Gregario Ovalle and Maria Del Carmen Ovalle, Appellants,**

v.

**Joann Salinas–Cardosi, Appellee.**

No. 96,396.

Supreme Court of Oklahoma.

Jan. 14, 2003.

Certiorari Denied Feb. 10, 2003.

Rehearing Denied March 21, 2003.

Rex D. Brooks, Oklahoma City, OK, for appellants.

Thomas Neil Lynn III, Gary A. Taylor, Legal Aid of Western Oklahoma, Inc., Oklahoma City, OK, for appellee.

WINCHESTER, J.

¶ 1 The issue before this Court is whether a mother who placed her minor child with her mother as guardian has met her burden to show that the guardianship should be terminated. We hold that she has not.

### FACTS

¶ 2 On October 16, 2000, Gregorio H. Ovalle petitioned for appointment as a co-guardian of A.G.S. Ovalle's wife, Maria Del Carmen Ovalle's, the maternal grandmother of A.G.S., had been the guardian since September 19, 1996. The Petition for the Appointment of a General Guardian, which Mrs.

Ovalle filed August 26, 1996, and resulted in her being appointed as guardian, stated that A.G.S. had resided with her since his birth on May, 20, 1996. The Ovalles are the appellants before this Court. On November 1, 2000, Joann Salinas–Cardosi, the appellee and mother of A.G.S., filed an application to terminate guardianship over her son. Salinas–Cardosi represented herself.

¶ 3 At the hearing on this matter, Salinas–Cardosi testified to the conditions that led to the guardianship. On December 6, 1995, Elifonsol P. Lopez, Jr., Salinas–Cardosi's boyfriend, was charged with the murder of Salinas–Cardosi's 23–month–old daughter. She died on August 13, 1995. Because Salinas–Cardosi was present in the apartment when her daughter was injured, she became a suspect. Between her daughter's death and the murder trial, Salinas–Cardosi gave birth to A.G.S. She testified that the district attorney's office advised her to arrange a guardianship for her son. Salinas–Cardosi agreed, fearing she could be jailed. At the termination hearing she testified that she had known nothing about her daughter's injuries, but agreed when she was cross examined that the medical evidence showed multiple injuries over a period of time. She testified she didn't know anything about those injuries since her daughter "didn't act any different."

¶ 4 The Ovalles offered several exhibits into evidence to which Salinas–Cardosi stated she had no objection. Exhibit number 2, "Certificate of Live Birth," reveals that A.G.S. was born about nine months after the murder. The petition to terminate the guardianship named the father of A.G.S.; it was neither Lopez nor her husband, Cardosi. Exhibit number 5 includes an "Information" charging Lopez with Murder in the First Degree, filed December 6, 1995. An order attached to the exhibit reflects Lopez was convicted and sentenced to life without parole on October 29, 1998.

¶ 5 Exhibit number 3, Salinas–Cardosi's petition for divorce, reveals she married Anthony Cardosi on December 5, 1997. That same exhibit also reveals Salinas–Cardosi filed for divorce within three months of her marriage to Cardosi. Exhibit number 1 is her petition for a protective order. The petition alleges that Cardosi threatened "bodily harm with imminent serious physical harm." It also alleges that Cardosi had stalked and threatened Salinas–Cardosi at home and at work. The petition stated, "Anthony has a very violent temper always wanting to beat someone up." The petition also stated that Salinas–Cardosi was pregnant from their union. The district court granted a temporary protective order and set a hearing for March 23, 1998, the same date that Salinas–Cardosi filed her petition for divorce. In Cardosi's answer to the petition for divorce, he claimed he was not the father of the unborn child, and asked for a DNA test.

¶ 6 Salinas–Cardosi testified that she and Cardosi had reconciled and blamed her mother for all of their problems. She denied that Cardosi ever hit her but admitted that they had been evicted from one of their apartments for arguing and fighting. She testified that neither she nor Cardosi use drugs, that no governmental agency had investigated their home, and that she had never been convicted of any crime of violence against children. She admitted that Cardosi was unemployed, that she worked part-time, and that the couple had financial problems. In response to questions by the trial judge, Salinas–Cardosi testified that she and Cardosi have two children, who have resided with them since their births. She did not call any other witnesses.

¶ 7 The Ovalles first witness was a homicide detective from the Oklahoma City Police Department. He investigated the death of Salinas–Cardosi's daughter. He testified that at the time of the investigation Salinas–Cardosi lived with her daughter in an apartment in which Lopez occasionally stayed. Lopez was not the girl's father. Her father was incarcerated at the time of the murder. The detective testified that, while Salinas–Cardosi was asleep, her daughter received the injury that resulted in her death. The detective testified that the dress the girl was wearing had been ripped in several places and that she died of blunt trauma resulting in subdural hematoma. The detective further testified that although Salinas–Cardosi was investigated as a suspect, she passed a

polygraph examination and became a witness in the murder trial. Because of that, the district attorney determined not to charge her.

¶ 8 One of Mrs. Ovalle's co-workers, who had known her for four years, testified that she had seen Salinas–Cardosi at the Ovalles' home. Salinas–Cardosi had a bruise on her cheek. An affidavit of that witness was admitted as evidence. It stated that the witness had seen Salinas–Cardosi with bruises on her face at least two times, that she always seemed scared and withdrawn and in a hurry to return home before her husband found out she was at the Ovalles' home.

¶ 9 Michael Anthony Glossbrenner, who is married to Salinas–Cardosi's sister, testified that she and Cardosi had been to the Glossbrenner's house. Cardosi was drunk and upset and started yelling before the night was over. Glossbrenner testified he had seen the bruises on Salinas–Cardosi's face under her makeup and that Cardosi admitted to him that he had hit his wife. Glossbrenner testified that A.G.S. told him that Cardosi both yelled at and hit A.G.S. Glossbrenner testified that he and his wife lived with the Ovalles from February to July of 2000, and that Salinas–Cardosi did not come by once to see her son. Glossbrenner's wife, Rosemary, testified that Cardosi was very violent and had even beaten Glossbrenner's brother. She also testified to bruises she had seen on her sister. Mrs. Glossbrenner testified that one time Cardosi had grabbed her face to force her to look at him while he argued with her. When she wanted to leave, he grabbed her wrist to hold her down.

¶ 10 Mrs. Ovalle testified that her daughter decided she wanted to became pregnant as a reaction to her daughter's death; that she wanted another little girl. Salinas–Cardosi became pregnant within two weeks of her daughter's murder. Mrs. Ovalle told the court that Salinas–Cardosi told her that if the baby was a boy, Mrs. Ovalle could have him, that she did not need a boy. Although Salinas–Cardosi cross examined Mrs. Ovalle, she did not question her on this subject.

¶ 11 Mrs. Ovalle testified that her daughter had been beaten by Cardosi. She testified that Cardosi habitually struck a fist into his other hand, threatening to beat up or kill someone. He even threatened Mrs. Ovalle. She stated that she obtained a Victim's Protective Order against Cardosi for that reason. Mrs. Ovalle testified that she and her husband had supported A.G.S. for the last four years, but had recently applied for child support. It was not until then that Salinas–Cardosi filed to have the guardianship terminated. Ovalle testified that she had seen bruises and bite marks on her daughter. She testified that A.G.S. told her that Cardosi had hit him once because he was playing too rough with his little sister.

¶ 12 The trial court concluded that no evidence was presented to show that Salinas–Cardosi was unfit to care for her son, and that the condition no longer existed which resulted in naming Maria as guardian. The judge stated that under the law, after concluding Salinas–Cardosi was not unfit, she only needed to apply to the court to have the guardianship terminated to recover custody of A.G.S. The judge added that he believed he was compelled under the law to set aside the guardianship if Salinas–Cardosi requested it. He made one requirement, that is, Salinas–Cardosi must obtain an apartment larger than the one-bedroom apartment she had at the time of the hearing. When the parties subsequently appeared before the trial court, Salinas–Cardosi submitted proof that she had leased a three-bedroom apartment, and the court dismissed the guardianship.

**Termination of Guardianship of a Minor**

¶ 13 The rule for termination of guardianship over a minor when a parent is the applicant is well settled. The guardianship may be terminated when the reasons for which it was established no longer exist. When the impediment to the natural parent's custody has been removed, the guardianship is no longer necessary unless its termination would be inimical to the welfare of the child. *Matter of Guardianship of M.R.S.*, 1998 OK 38, ¶ 26, 960 P.2d 357, 364. The questions here are, "What was the impediment?" and "Would termination of the guardianship be inimical to the welfare of A.G.S.?"

¶ 14 The trial court apparently concluded that no impediment existed because he stated that when he originally appointed Mrs. Ovalle as guardian, he placed no conditions on the mother to regain custody of A.G.S. The court concluded that all she needed to do was to apply to the court to have the guardianship terminated. The court did not find the mother unfit. But this Court is concerned that the termination of the guardianship is inimical to the welfare of A.G.S.

¶ 15 A parent must give her child the support and education suitable to his circumstances. 10 O.S.2001, § 4. The evidence suggests that Salinas–Cardosi was content to leave A.G.S. with her mother as guardian until two occurrences: Mr. Ovalle petitioned for appointment as co-guardian, and the Department of Human Services began the process of collecting child support on behalf of A.G.S. Exhibit 7 reveals Salinas–Cardosi was sent a "Notice of Support Debt and Hearing," filed September 28, 2000. Mrs. Ovalle testified that before that time, she and Mr. Ovalle supported A.G.S. There was no testimony denying this. A.G.S. was left with a guardian for four years before a petition was filed to terminate the guardianship. The reason for the guardianship, fear that the mother would be imprisoned, had been removed years before. There was substantial credible evidence to support the assertion that Salinas–Cardosi rarely visited A.G.S. before the Ovalles filed for child support, and that she did not even telephone her son. There was evidence presented that one of the reasons may have been her fear of her own husband.

¶ 16 The Ovalles filed a "Notice of Supplemental Authority" to bring 10 O.S.2001, § 21.3(C)(2) to this Court's attention. Apparently the statute was not discussed during the guardianship hearing. Salinas–Cardosi, who is now represented by counsel, moved to strike because the statute was in effect at the time of the hearing. She argues that considering the statute violates Oklahoma Supreme Court Rule 1.179(g), which provides that a party may file a notice of supplemental authority while a petition for certiorari is pending that calls attention to new cases or legislation unavailable at the time of that party's last filing. Salinas–Cardosi also argues that the statute cited is inapplicable because it concerns intra-familial custody of children without court involvement.

¶ 17 Section 21.3(C)(2) gives guidelines concerning the best interests of a child where an action is before a court to determine custody of a child pursuant to subsection C. The statute restates what a court may consider concerning the best interests of a child. Section 21.3 is entitled "Right to Custody." It describes who may accept custody of a child and what steps they must take to obtain custody. It does not include a change of custody from one parent to the other parent. Subsection B provides, among other things, that an adult relative who is related to a child within the third degree may accept the permanent care and custody of the child without a court order and by operation of law, if the child is abandoned by a parent or parents to the physical custody of such relative pursuant to the provisions of § 21.3. Subsection C provides that such child may not be reclaimed or recovered by the parent or parents except through an order of a court of competent jurisdiction or by release of the child by such relative.

¶ 18 The statute further provides that in an action to determine custody of the child pursuant to this subsection (C), the court shall base its findings and determination of custody on the best interests of the child and four specific considerations:

"(a) the duration of the abandonment and integration of the child into the home of the relative, (b) the preference of the child if the child is determined to be of sufficient maturity to express a preference, (c) the mental and physical health of the child, and (d) such other factors as are necessary in the particular circumstances."

¶ 19 None of these considerations is incompatible with the "best interests of the child" test or the consideration of whether termination of a guardianship is "inimical to the welfare of the child."

¶ 20 This Court has several concerns about Salinas–Cardosi's custody of A.G.S. The evidence reveals that Salinas–Cardosi's daughter who was murdered had older injuries. Salinas–Cardosi claimed that she did not notice anything wrong, even though Mrs. Ovalle had warned her about leaving the girl with Salinas–Cardosi's boyfriend. Salinas–Cardo-

si became pregnant within nine months of the death of her daughter, and then left A.G.S. with her mother as guardian long after the impediment leading to the guardianship was removed. Even after she was married, was employed and had two daughters, she neither paid support to Mrs. Ovalle, nor attempted to terminate the guardianship, that is, until Mr. Ovalle petitioned to be named co-guardian and Mrs. Ovalle asked for child support. There is strong evidence from numerous witnesses, including admissions from Salinas–Cardosi that her husband is quick tempered and prone to violence. Several witnesses testified that Salinas–Cardosi had unexplained injuries and bruises. The fact that there is no evidence that A.G.S. has been physically abused does not overcome the fact that a violent home is inimical to the welfare of a child. In summary, Salinas–Cardosi's home in which her daughter was murdered was one in which violence was ignored either through ignorance of the signs or intentional neglect. The evidence reveals that her home is still one of violence. Salinas–Cardosi has not met her burden of showing that the impediment leading to the guardianship has been removed. *Matter of Guardianship of M.R.S.*, 1998 OK 38, ¶ 26, 960 P.2d 357, 364–365. We find this evidence to be clear and convincing and that the decision of the trial court was against the clear weight of the evidence.

¶ 21 Accordingly, we remand this cause to the trial court with directions to return custody of A.G.S. to Mrs. Ovalle, and to reconsider the application for co-guardianship by Mr. Ovalle.

**CERTIORARI PREVIOUSLY GRANTED; COURT OF CIVIL APPEALS OPINION VACATED; JUDGMENT OF THE DISTRICT COURT REVERSED AND REMANDED.**

CONCUR—WATT, C.J., OPALA, V.C.J., HODGES, LAVENDER, HARGRAVE, KAUGER, and BOUDREAU, JJ.

CONCUR IN PART; DISSENT IN PART—SUMMERS, J.