2007 OK CIV APP 75

**In the Matter of the GUARDIANSHIP OF J.J.H., an alleged deprived child.**

**Joie Lynn Bart and Stephan Eugene Bart, Petitioners/Appellees,**

v.

**Bobby Hamby, Respondent/Appellant.**

**No. 103,287.**

Court of Civil Appeals of Oklahoma, Division No. 2.

July 27, 2007.

---

James I. English, III, Ardmore, OK, for Petitioners/Appellees.

Darryl F. Roberts, Ardmore, Oklahoma and R. Scott Adams, Adams & Associates, P.C., Oklahoma City, OK, for Respondent/Appellant.

JOHN F. FISCHER, Presiding Judge.

¶ 1 Appellant Bobby Hamby appeals from the Trial Court's order granting general guardianship of his daughter JJH to the Appellees Joie and Stephan Bart. Based on our review of the record on appeal and applicable law, we affirm.

## BACKGROUND FACTS

¶ 2 In this appeal, Hamby raises two issues: (1) the decision of the Trial Court was against the clear weight of the evidence and (2) the evidence is insufficient to support the finding that he is "unfit" to parent JJH.[1] Because Hamby challenges the evidentiary basis for the Trial Court's decision, a detailed review of the record is necessary.

¶ 3 On January 23, 2004, JJH was born to Ashley Williams. The child's birth certificate lists Hamby as the father and it does not appear disputed that he is the child's natural father. Williams and Hamby have one other child together but have never been married during their five-year relationship.[2]

---

1. In his petition in error, Hamby listed three other issues to be raised on appeal: (1) "Denial of the Respondent Bobby Hamby's constitutional right of confrontation;" (2) "Failure of proof upon which the Petition of Guardianship of Minor was commenced;" and (3) "Commencement of proceedings without notice to the father." Because Hamby did not present any argument or authority regarding these three issues in his brief on appeal, we do not address them. *See In re A.A.C.P.*, 2006 OK CIV APP 32, ¶ 4, 132 P.3d 644, 646 ("Only those allegations of error urged in the briefs will be addressed, the remainder being deemed waived").

2. Hamby has two other children from a previous marriage.

¶ 4 Although JJH is the couple's second child together, the parental rights of both Williams and Hamby to their first child were terminated in February 2004. The record in that case, which was considered by the Trial Court, showed that the child was hospitalized after his premature birth with a serious illness and, during the six or seven months that he was in the hospital, Hamby visited twice and telephoned once.[3] Hamby testified that he voluntarily gave up his parental rights to the couple's first child because he "needed some help [himself] at the time" due to his drug dependency and because the child was sick and required expensive medical care that he could not afford. The Trial Court challenged the credibility of this testimony, describing that explanation as misleading. According to the Trial Court, it was more accurate that Hamby "fought it down to the wire" and, after obtaining two or three continuances, only relinquished his parental rights just before the jury trial was scheduled to begin.

¶ 5 When Hamby relinquished his parental rights to the couple's first child, he was on probation serving a five-year sentence for Possession of a Controlled Substance. His sentence is scheduled to be discharged in 2008. It appears that the District Attorney moved to revoke Hamby's probation in November 2003, which resulted in, or coincided with, Hamby entering the Clean Start drug rehabilitation program. Hamby was still on probation at the time of these proceedings.

¶ 6 Prior to the birth of JJH, Williams voluntarily entered a drug rehabilitation program at Monarch Rehabilitation Center. During the seven months Williams was at Monarch, Hamby visited her approximately every Sunday, according to Williams, "When he could." After Williams completed the program at Monarch, Hamby continued to see her and JJH approximately every other weekend. Most or all of these visits occurred at Hamby's home in Wellston. For a few months after JJH was born, when Williams needed money, Hamby gave her $50

a week. He stopped giving her money because he thought it was no longer beneficial. Hamby did not otherwise contribute to JJH's support until ordered to do so by the Trial Court in this proceeding.

¶ 7 Hamby and Williams were no longer living together and had ended their relationship by the time these proceedings began. On September 2, 2005, Williams brought JJH to visit her sister Joie Bart in Ardmore, Oklahoma. Following the visit, Williams left JJH in Bart's care with the intention of returning the next day. Three days later, Williams telephoned Bart and asked her to keep JJH for a few more days. Several days later, Williams met with Bart and agreed that JJH would be better off if cared for by Bart and her husband and left the child in their custody.

¶ 8 After learning that JJH was with the Barts, Hamby drove to Ardmore on September 15, 2005. The record contains conflicting evidence as to whether Hamby intended to retrieve JJH or was simply going to visit. When he arrived at the Bart residence, a police officer and a representative from the Department of Human Services (DHS) met him. DHS worker Lyndsi Vaile informed Hamby that he would have to leave JJH in the custody of either DHS or the Barts, pending an investigation of the child's welfare. Hamby agreed to leave JJH with the Barts and signed a document to that effect.

¶ 9 On October 26, 2005, the Barts filed a petition for general guardianship of JJH pursuant to the Oklahoma Guardianship and Conservatorship Act, 30 O.S. Supp.2004 §§ 1–101 through 4–903. The Trial Court set the matter for hearing on November 9, 2005. On November 8, 2005, counsel for Hamby requested, and was granted a continuance of the hearing. The hearing was reset for January 5, 2006. On the day of that hearing, Hamby filed a petition for writ of habeas corpus seeking custody of JJH. By Journal Entry dated January 18, 2006, the Trial Court granted temporary custody of

---

3. The court in that case adjudicated the child deprived on April 18, 2003, and issued a dispositional plan, ordering both parents to seek drug counseling and anger management. After both parents were unresponsive to the dispositional plan, the court set the case for trial for the termination of both parents' parental rights on its March 2004 docket. Hamby relinquished his parental rights to the child on February 5, 2004.

JJH to the Barts, denied Hamby's petition for writ of habeas corpus, granted Hamby custodial visitation, ordered him to pay child support and set the matter for trial.

¶ 10 The Trial Court conducted a non-jury trial on February 13, 2006, and received additional evidence on March 29, 2006, prior to the pronouncement of its decision. The following evidence appears of record.

¶ 11 Williams and Bart testified that Hamby was still regularly using illegal drugs. Williams testified that she and Hamby used drugs together during the summer of 2005 and as late as August 2005. She further testified that she had witnessed Hamby using drugs as recently as the week before the trial in February 2006.

¶ 12 Hamby admitted that he had previously been addicted to drugs but testified that he had been "clean and sober" since November 2003. Hamby submitted nineteen voluntary and involuntary, random and scheduled narcotics tests taken between December 2003 and March 2006. Every test Hamby submitted reflects a negative test result. The involuntary tests were part of Hamby's probation, covering the period from December 2003 through May 2004. The other tests were voluntarily taken by Hamby at a clinic in Oklahoma City approximately 35 miles from his home in Wellston. The voluntary tests cover the time period from November 21, 2005, through March 23, 2006. No tests were provided for the June through August 2005 time period during which Williams testified she and Hamby were using drugs together. However, Hamby did provide a February 6, 2006, test in response to Williams's testimony that she had seen him using drugs about one week before the February 13 hearing. Hamby not only denies any current drug use but also contends that Williams's testimony is not credible because she admitted on cross-examination that she lied about her own drug use in an effort to convince DHS to place JJH with Bart.

¶ 13 Hamby testified that since the order of January 18, 2006, he had overnight visits with JJH pursuant to the visitation schedule established by the Trial Court. He further testified that he had made all child support payments due to his former wife concerning his teenage children. Hamby and his mother also testified that his home in Wellston was clean, and that she was available to take care of JJH while Hamby was working, despite the fact that, occasionally he would be gone for several days at a time.

¶ 14 Hamby denied Williams's testimony that another woman and her two children were living with him in Wellston. He explained that, on occasion, she would spend a day or two at his home with her children and that she was in the home the week prior to trial when Williams arrived at his house at two or three in the morning.

¶ 15 Bart testified that, during the first four months in which she had custody of JJH, Hamby visited the child on three occasions for about one hour each time. During these visits he did not change a diaper or ask to take JJH for a visit to his home in Wellston. Bart testified that on one occasion prior to September 2005, Hamby left Williams and JJH on the side of the road and on other occasions refused to help them when they were in need of help. She also testified that there had been incidences of domestic abuse for which Hamby had been "red flagged" by DHS. Williams confirmed the domestic abuse in her testimony and Hamby did not dispute this testimony.

¶ 16 Lyndsi Vaile, the DHS social worker assigned to this case, testified that she first met Hamby on September 15, 2005, at the Barts' home in Ardmore. Vaile testified that Hamby agreed to leave JJH with the Barts until DHS completed its investigation because he said that he was not responsible enough to care for JJH at the time. Vaile did not recall hearing from Hamby after September 15, although she did recall being contacted by a lawyer representing him. Vaile completed her investigation and determined that JJH was safe with the Barts and sent a copy of her investigation to Hamby. Her report also contained an investigation from a Lincoln County social worker who found that Hamby's home was in good condition. Vaile recommended that Hamby prove he could provide a stable home for JJH before moving the child from the Barts' home.

¶ 17 At the conclusion of trial on March 26, 2006, the Trial Court found that Hamby was unfit to parent JJH and granted the Barts' petition, appointing them as general guardians for the child and granting Hamby custodial visitation. Hamby appeals that portion of the Trial Court's order granting guardianship.

## STANDARD OF REVIEW

■ ¶ 18 In appointing guardians, courts are vested with sound legal discretion and their judgments will not be overturned absent an abuse of discretion. *Brigman v. Cheney*, 1910 OK 316, 112 P. 993, syl. 1. Abuse of discretion occurs "when a court bases its decision on an erroneous conclusion of law or where there is no rational basis in evidence for the ruling." *Christian v. Gray*, 2003 OK 10, ¶ 43, 65 P.3d 591, 608.

## DISCUSSION

¶ 19 Hamby argues that 10 O.S. Supp.2004 § 21.1 is controlling, and that, pursuant to subsection D, the Trial Court was required to find that he was an alcohol or drug dependent person who could be expected to seriously harm himself or others. He contends that the Trial Court made no such finding and that there is an absence of evidence in the record on which the Trial Court could have made a finding that he was unfit. Hamby concludes, therefore, that "none of the [section 21.1(D)] standards would disqualify [him] from having the custody of his daughter." This argument is misdirected for three reasons: (1) custody is not an issue in this appeal; (2) section 21.1 is not controlling; and (3) a finding of unfitness is not required.[4]

### I. Custody

¶ 20 While this case involves the competing claims of custodial relatives and the noncustodial father, custody is not an issue in this appeal. Hamby did not appeal the January 18, 2006, Journal Entry denying his petition for habeas corpus in which he sought to

obtain custody of JJH. Further, because the time to appeal that decision has passed, the Trial Court's ruling on the matter is now final. *See* Okla. Sup.Ct. R. 1.21, 12 O.S. Supp.2006, ch. 15, app. 1. Also, Hamby did not list the Trial Court's ruling on custody as one of the issues to be reviewed on appeal in his petition in error.

¶ 21 When JJH was born, Williams and Hamby were not married. Consequently, Williams had sole custody of the child. *See* 10 O.S.2001 § 6 ("Except as otherwise provided by law, the mother of an unmarried minor child born out of wedlock is entitled to the care, custody, services and earnings and control of such minor"). *See also State v. Johnson*, 1988 OK CR 273, ¶ 9, 765 P.2d 1226, 1228.

¶ 22 Joie Bart, however, had custody of JJH when these proceedings began. Pursuant to 10 O.S.2001 § 21.4(B)(3), Williams relinquished custody of JJH to Bart by abandoning the child. Joie Bart, "an adult relative related to the child within the third degree," is a person authorized by law to accept custody of a minor from his or her parent. 10 O.S.2001 § 21.3. Bart acquired custody of JJH in September 2005 "by operation of law." 10 O.S.2001 § 21.3(B)(3). Hamby took no action to acquire custody of JJH prior to filing his January 2006 petition for writ of habeas corpus in this case. As previously discussed, the Trial Court denied his petition and Hamby has neither appealed that decision nor included the issue of custody in his petition in error.

### II. The Controlling Statute and Unfitness

■ ¶ 23 Because Joie Bart had custody of JJH, it was not necessary for her to seek to establish custody in this action. Consequently, she merely sought guardianship of JJH. Guardianship and custody are separate matters. *See Ex parte Fortune*, 1936 OK 46, ¶ 0, 53 P.2d 1100 (Syllabus 2)(holding that, in the trial of a habeas corpus proceeding instituted by a guardian to obtain custody of his

---

4. Although we conclude that the Trial Court was not required to find that Hamby was unfit in order to grant the Barts' guardianship petition, we have no difficulty concluding from this record

that the Trial Court's finding of Hamby's unfitness was not against the clear weight of the evidence.

ward, issuance of the guardianship letters did not constitute an adjudication of the right to custody and was not conclusive on the question of custody). *See also Application of Boyd,* 1954 OK 235, 274 P.2d 399. A guardian:

> is vested with the legal capacity to act for and in behalf of the minor in providing for the minor's care and support and in administering the minor's estate. A guardian does not stand in the place of the parents to the exclusion of the parents' natural rights, privileges and obligations.

*Wilkerson v. Davila,* 1960 OK 63, ¶ 30, 351 P.2d 311, 315. A guardian is a person appointed by the court to take care of the person or property of another, 30 O.S.2001 § 1–105, and has only those powers granted by the court. 30 O.S.2001 § 1–119. The order appointing guardians in this case makes no provision for custody.[5] Consequently, we are not concerned with the procedure in 10 O.S. Supp.2004 § 21.5 for the award of permanent custody to an adult relative guardian.

¶ 24 The Barts proceeded pursuant to the Guardianship Act, the authority cited in their petition. Specifically, they relied on section 2–101 of the Guardianship Act, which authorized the Trial Court to appoint a guardian for JJH "when it appears necessary or convenient." That act, not section 21.1 of title 10 as Hamby argues, is the controlling statutory authority.

¶ 25 The meaning of the "necessary or convenient" language of the Guardianship Act has been the subject of substantial litigation, most often involving cases in which the guardianship and custody issues were not distinguished and the issue before the court was whether to terminate rather than establish a guardianship. For example, one of the leading cases in this area involved a proceeding to terminate the guardianship of a minor pursuant to 30 O.S.1991 § 4–804, by the child's natural father. *In re M.R.S.,* 1998

OK 38, 960 P.2d 357. The guardianship had been established when the father and sole custodian of the child agreed to the guardianship because he was single at the time, on call by his employer twenty-four hours a day and seven days a week and, therefore, unable to care for the child. The order appointing the guardians specifically found that the father was not unfit. *Id.* at ¶ 3, 960 P.2d at 359.

¶ 26 After the father remarried, he moved to terminate the guardianship on the basis that it was no longer necessary because the conditions that gave rise to the need for the guardianship no longer existed. The trial court dealt with the matter as if it were a proceeding to modify a custody order in a divorce proceeding requiring the father to show a substantial and material change in circumstances. The Oklahoma Supreme Court reversed, based on a long line of well-established authority, reaffirming that the proper test for termination of the guardianship of a minor is whether (1) the impediments that led to the guardianship have been removed and (2) termination of the guardianship would not be inimical to the welfare of the child. *Id.* at ¶ 26, 960 P.2d at 364–65.[6]

¶ 27 More recently, the Oklahoma Supreme Court reversed the termination of a guardianship finding that the mother had failed to prove the impediments that led to the guardianship no longer existed. *See In re Guardianship of A.G.S.,* 2003 OK 1, 65 P.3d 587. In *A.G.S.,* the mother arranged the guardianship because she had been informed by the District Attorney that she would be prosecuted as an accomplice in the murder of her other child and incarcerated if convicted. When the prosecution did not materialize, the mother moved to terminate the guardianship. She had not been found "unfit" by the court that had established the guardianship, and the court hearing her petition to terminate the guardianship specifically found that there was no evidence to show that she was

---

5. These authorities also establish that it was not necessary that Stephan Bart had custody of JJH to be appointed her guardian because guardianship and custody are separate matters. Consequently, Stephan Bart may be appointed as a guardian for JJH even though Joie Bart is the child's sole custodian.

6. Much of the *M.R.S.* opinion discusses the applicable test for depriving a parent of custody of a child, which requires proof that the parent is unfit. As previously discussed, Hamby's right to custody of JJH is not an issue in this appeal.

unfit at the time of the termination proceeding. *Id.* at ¶ 12, 65 P.3d at 589. Nonetheless, various factors, including the continuation of a violent home environment in which the child would be raised, established that the mother had failed to meet her burden of proving that she had removed the impediments on which the guardianship had originally been established. *Id.* at ¶ 20, 65 P.3d at 590–91.

 ¶ 28 From these cases, it is clear that the "necessary or convenient" standard of section 2–101 does not require proof of parental unfitness before a guardianship may be established. Establishment of a guardianship is a temporary determination and appointment of the person who will be responsible for the care of a child and may legally act on behalf of the child. *M.R.S.,* 1998 OK 38 at ¶ 9, 960 P.2d at 360. Termination of a guardianship over a child may be sought by a parent at any time. On proof that the impediments justifying the guardianship no longer exist and absent proof that termination would be inimical to the welfare of the child, a parent is entitled to have the guardianship terminated. 30 O.S.2001 § 4–804; *A.G.S.,* 2003 OK 1 at ¶ 13, 65 P.3d at 589 (citing *M.R.S.,* 1998 OK 38, ¶ 26, 960 P.2d 357, 364). Consequently, termination of a guardianship necessarily involves consideration of a parent's fitness because ending the guardianship is not permitted if it would be inimical to the welfare of the child. Neither the guardianship statute nor previous Supreme Court decisions imposes this same requirement on the establishment of a guardianship.

¶ 29 When custody is not at issue, the factors to be considered when establishing a guardianship are those that show the guardianship is "necessary or convenient." For example, a single parent leaving the country for an extended period of time may choose to establish a guardianship for his or her minor children who will remain in this country because it is "necessary or convenient" to have someone to care and act for the children in the parent's absence. Under those circumstances, that choice may evidence parental responsibility rather than parental unfitness. We find nothing in either the language of the statute or any test established by the Oklahoma Supreme Court that, under the circumstances of this case, would have required the Barts to prove Hamby's parental unfitness prior to the establishment of the guardianship.[7]

¶ 30 Even though proof of parental unfitness is not required, there are three other considerations that direct a trial court's determination of when a guardianship is "necessary or convenient." First, section 1–112(C) of the Guardianship Act provides that it "shall not be construed to limit the parental rights of parents as the natural guardians of their children." With respect to a child whose mother and father were not married when the child was born, the common law provides that the mother is the natural

---

7. In a mother/custodial parent's appeal from the trial court's appointment of maternal grandparents as guardians for her child, another division of this Court determined, under circumstances where custody was at issue, that the same proof was necessary to either establish or terminate a guardianship of a minor child. *In re Guardianship of H.D.B.,* 2001 OK CIV APP 147, 38 P.3d 252. Thus, the court in *H.D.B.* held that a trial court must make specific findings regarding the parent's unfitness as well as the child's best interests before a minor is placed with a third party over the objection of one or both parents. *Id.* at ¶ 16, 38 P.3d at 256. We note that, in reaching its decision, the court in *H.D.B.* relied on *M.R.S.,* 1998 OK 38 at ¶¶ 16–25, 960 P.2d at 362–64 (requiring application of the parental preference doctrine when custody is at issue and third parties challenge the right of a parent) and *McDonald v. Wrigley,* 1994 OK 25, 870 P.2d 777 (holding, where paternal grandmother sought to obtain custody of child from the mother by intervening in a divorce action and filing a motion to modify, the controlling statute, 10 O.S.2001 § 7006–1.1 requires clear and convincing evidence of the mother's unfitness and notice to her of the conditions found by the trial court to constitute parental unfitness so that the mother knows what, if corrected, would amount to a change of circumstances allowing the mother to regain custody). The court decided *H.D.B.* without the benefit of the more recent Supreme Court pronouncement in *In re A.G.S.,* in which the mother, who was found to be fit, was, nonetheless, not permitted to terminate a guardianship. *A.G.S.,* 2003 OK 1 at ¶ 14, 65 P.3d at 590. Further, the court decided *H.D.B.* on facts not present in this case. This is not a divorce or termination proceeding governed by section 7006–1.1. Hamby has never had custody of JJH and his fitness is not a factor to be determined in deciding the Barts' guardianship petition.

guardian. 1 William Blackstone, Commentaries *460 n. 4. Oklahoma law reflects this common law principle. *See* 10 O.S.2001 § 6.[8] Consequently, Hamby is not the natural guardian of JJH. Although he may establish rights to the services, earnings and control of JJH in the future, he had not done so at the time of these proceedings. Appointment of the Barts as guardians for JJH in this proceeding is consistent with section 1–112(C). The purpose of the Guardianship Act is to establish a system of guardianship for minors that provides for the protection of their rights. Children have a fundamental constitutional right to a "wholesome environment" equal to the constitutional rights of parents. *In re T.H.L.*, 1981 OK 103, ¶ 13, 636 P.2d 330, 334.

¶ 31 Second, in appointing a guardian the court is to be "guided by" 10 O.S.2001 § 21.1. *See* 30 O.S.2001 § 2–103. Therefore, although section 21.1 is clearly relevant to the appointment of a guardian, it is not, as Hamby argues, the controlling statute.[9] Section 21.1(A) provides the preference order for awarding custody or appointing guardians providing, as relevant to this case, that the parents are first and relatives of the parents are next. While the court is to be guided by the statute's preference order, section 2–103 does not mechanically impose this order on the guardianship process or remove the court's discretion in appointing guardians. On this point, we find persuasive the decision in *Smith v. Neher*, 1992 OK CIV APP 97, 837 P.2d 929, 931 (rejecting the argument that the preference order in section 21.1 is "absolute").

¶ 32 Third, section 2–106 of the Guardianship Act provides that a parent who petitions for guardianship, unless "otherwise unsuitable or disqualified," is entitled to guardianship of his or her minor children. Section 2–106 is not applicable because the petition before the Trial Court in this case was filed by the Barts. Hamby has not sought to be appointed as guardian for JJH.[10]

¶ 33 Consequently, in the context of this case in which a noncustodial parent sought to prohibit a custodial relative from being appointed guardian, the issue to be determined by the Trial Court was whether appointment of the Barts was "necessary or convenient." The burden of proof, as in other civil matters, was on the Barts to establish that proposition. *Standard Marine Ins. Co. v. Traders' Compress Co.*, 1915 OK 284, ¶ 8, 148 P. 1019. Because neither termination of parental rights nor transfer of custody is at issue, we do not find that the "clear and convincing" level of proof required in those cases is applicable. *See In re C.G.*, 1981 OK 131, ¶ 19, 637 P.2d 66, 71–72 (termination of parental rights); *M.R.S.*, 1998 OK 38 at ¶ 12, 960 P.2d at 361 (transfer of custody). The order appointing guardians in this case does not determine, much less terminate, Hamby's parental rights; it does not deprive him of custody and it does not preclude a subsequent order terminating the guardianship "when no longer necessary." 30 O.S.2001 § 4–804.

## CONCLUSION

¶ 34 Having reviewed the record, we do not find that the Trial Court abused its discretion by granting the Barts' petition to appoint them general guardians of JJH. Accordingly, we affirm the order of the Trial Court.

¶ 35 **AFFIRMED.**

WISEMAN, J., concurs, and RAPP, C.J., dissents.

---

8. *See* 30 O.S.2001 § 2–102(A)(2)(providing that only the mother of a child born out of wedlock may nominate a guardian if the natural father has not acknowledged paternity pursuant to statutory procedure or been judicially determined to be the father). Although the parties do not dispute Hamby's paternity of JJH, there is nothing in the record on appeal showing that his paternity has been established by either of these methods. *Cf., Buxton v. Wilson*, 1982 OK 138, 654 P.2d 1048.

9. Further, Hamby's argument that there was no evidence in the record to support a finding that he was a person described in the seven section 21.1(D) factors is equally misplaced. The criteria discussed in that paragraph apply not to Hamby but to the Barts, the "individual[s] seeking ... guardianship." There is no evidence in this record, and Hamby does not argue, that the Barts meet any of the seven "disqualifying" criteria in section 21.1(D).

10. There is little doubt, however, that had Hamby filed his own petition for guardianship, the Trial Court would have found him unsuitable on the basis of this record.

RAPP, C.J., dissenting:

¶1 I dissent. I note that the Majority opinion disagrees with *In re Guardianship of H.D.B.*, 2001 OK CIV APP 147, 38 P.3d 252. However, the present appeal is not a matter of guardianship termination. Next, and of paramount import, it fails to recognize that the key factor in cases dealing with children is—what is in the child's best interest. As pointed out in *In re Guardianship of H.D.B.*:

> The best interests of the child test in Anglo–American legal systems considers a number of factors: (1) the desires of the child; (2) the emotional and physical need of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Yavapai–Apache Tribe v. Mejia*, 906 S.W.2d 152, 168 (Tex.Ct.App.1995). Moreover, in this vein, the Oklahoma Supreme Court, construing 58 O.S.1971, § 876, now codified as 30 O.S.1991, 4–804, [sic] cited above, has ruled that parental fitness and a child's best interests are elements to be established before a minor's guardianship is terminated as no longer being necessary. *In re Guardianship of Hatfield*, 1972 OK 10, ¶8, 493 P.2d 819, 821.

*In re Guardianship of H.D.B.*, 2001 OK CIV APP 147 at ¶15, 38 P.3d at 256.

¶2 This does not appear to have been done here. Accordingly, I would reverse and remand.