2013 OK CIV APP 19

**In the matter of L.W.H., A.L.H. and J.R.H., Deprived Children:**

**Candice Wooten, Appellant,**

v.

**State of Oklahoma, Appellee.**

No. 110,529.

Court of Civil Appeals of Oklahoma, Division No. 3.

Dec. 21, 2012.

Michael Arnett, John Thomas Hall, Arnett Law Firm, Oklahoma City, Oklahoma, for Appellant.

David W. Prater, District Attorney, Jaelyn Rivera, Assistant District Attorney, Oklahoma City, Oklahoma, for Appellee.

WM. C. HETHERINGTON, JR., Judge.

¶ 1 Candice Wooten appeals the termination of her guardianship of L.W.H., A.L.H., and J.R.H. (the Wards) following the filing of separate motions for such termination by the Wards and the State of Oklahoma. The judgment of the trial court terminating C.W.'s guardianship of the Wards due to an abuse of her fiduciary duties and her continued failure to perform her duties as a guardian, and because it was no longer proper that they remain under guardianship is **AFFIRMED.**

*FACTS*

¶ 2 Candice Wooten (C.W.), the children's maternal grandmother, and Roger Wooten (R.W.), their maternal grandfather, (collectively, Guardians) petitioned to assume guardianship of the Wards on July 9, 2008, and their petition was granted. On July 9, 2008, Guardians also filed a plan for the care and treatment of the Wards. Under that plan, Guardians state they will provide or obtain food, clothing, shelter, schooling, and doctor visits for the Wards. The trial court appointed the Public Defender of Oklahoma County as Guardian Ad Litem for the Wards in a July 21, 2008 Order.

¶ 3 Thereafter, the file contains a Petition filed by the Oklahoma County District Attorney on June 5, 2009, in Case No. JD–2009–271, alleging the Wards were deprived children, alleging several grounds for adjudication as to their parents and that as to Guardians, the Wards lacked proper care, their home was unclean and unsafe, their home was not a fit one due to neglect, and there was substance abuse including the misuse of prescription drugs in the home. The June 5, 2009 Petition also alleges R.W. is physically unable to provide the children with proper care. In a June 22, 2009 Pretrial Journal Entry, temporary custody of the Wards was continued with the Oklahoma Department of Human Services (DHS) and R.W. was stricken from the Petition by the State. On that same date, a drug test for C.W. was positive for benzodiazepine, marijuana and opiates.

¶ 4 On August 24, 2009, the trial court entered an Adjudication Order finding the failure to appear that day by both the Wards' parents and C.W. constituted consent to adjudication of the Wards as deprived children. DHS's temporary custody was ordered con-

tinued, and DHS was ordered to prepare an individualized service plan (ISP) for the children. The trial court also entered a finding that continuation of reasonable efforts to reunite the Wards with their family was unnecessary pursuant to 10 O.S.Supp.2009 § 7003–4.6 (renumbered as 10A O.S.Supp.2009 § 1–4–809, amended eff. June 8, 2012).

¶ 5 The order granting guardianship of the Wards does not appear in the designated appellate record. However, in a December 20, 2010 Motion to remove their guardians and for termination of guardianship pursuant to 30 O.S.2001 § 4–801 filed by the Wards in the guardianship proceedings, *i.e.,* Case No. PG–2008–0417, they allege Guardians'. petition for guardianship was granted "on or about January 29, 2008 [sic]." [1]

¶ 6 In their December 20, 2010 Motion, the Wards claim DHS had filed a second amended petition on November 16, 2010, in Case No. JD–2009–271 seeking an adjudication of them as deprived children, termination of parental rights, and to make them wards of the Court rather than of Guardians.[2] According to the Wards' December 20, 2010 Motion, further review in the guardianship proceedings (Case No. PG–2008–417) were not conducted because of this filing. They ask that, for purposes of judicial economy and their benefit, the determination of their motion to terminate the guardianship be transferred to the judge conducting the proceedings to terminate parental rights. On February 24, 2011, that transfer was approved, and the motion was transferred from Case No. PG–2008–417 to Case No. JD–2009–271. The record contains no other explanation for the serialization of the proceedings and the long delays before determination of the Wards' December 20, 2010 Motion in early 2012.

¶ 7 In a request filed on February 28, 2011, the Wards' mother consented to a voluntary termination of her parental rights. Their Father consented to termination of his pa-

rental rights in a request filed on March 1, 2011. The trial court approved each request on their respective consent dates.

¶ 8 On November 29, 2011, an assistant district attorney, on behalf of the State, filed a Third Amended Petition seeking termination of the Wards' guardianship by C.W. and R.W. The Petition alleges, *inter alia,* that the Wards were adjudicated deprived and they were removed from the Guardians for neglect which included maintaining a home which was unclean and unsafe, C.W. has had an ISP and the opportunity to correct conditions but has failed to do so, DHS will not approve the home for placement, and "there is no longer a purpose to the guardianship and the guardianship should be terminated." The State's petition argues Guardians "should have been removed" at the time the Wards were adjudicated as deprived and requests termination of the guardianship of C.W. and R.W. under 30 O.S.2001 § 4–801 for their "continued failure to perform" their duties, as to C.W. because "it is no longer proper that the children should be under guardianship," and as to R.W. due to his "incapacity to perform his duties."

¶ 9 Hearings on the issue of termination of guardianship were conducted on July 1, 2011, February 14, 2012, and February 15, 2012. At the hearing the trial court clarified that the sole and limited issue before it was the termination of guardianship under § 4–801, not issues relating to C.W. with respect to the adjudication of the Wards as deprived. Citing his health, R.W. stipulated he was willing to have guardianship terminated as to himself. The following facts, statements, and claims are those testified to at the hearings.

¶ 10 C.W., the first witness, acknowledged that her guardianship was a temporary one. She admitted to having difficulty providing for the Wards when they were in her home and that led her to apply for food stamps and

---

1. No order bearing this date was designated for inclusion in the appellate record nor does the docket in the guardianship case reflect an order bearing this date. However, neither party disputes C.W.'s appointment as a guardian, and an October 29, 2008 Court Minute states further review in the case is continued until January 6,

2009 and "[i]n the interim" the court orders that "guardian will take" the Wards for visitation according to terms therein specified.

2. This petition also was not designated for inclusion in the appellate record.

other assistance. Her home and two others adjacent to it had been purchased by her own parents. The home received water *via* a connection to a well near one of the other houses. Recently, her daughter, who resided at the adjacent house, turned off Guardians' water connection. There was no city water supply, so she hauled water to her home in barrels and had made arrangements for another well to be drilled.

¶ 11 According to C.W., for the preceding two to three years she had prescriptions for opiates Hydrocodone (10 mg. three times a day) and Oxycodone (30 mg. twice a day) and for the benzodiazepine Xanax (1 mg. per day). During the period she was being tested for drugs, she tested positive three times for amphetamine, for which she did not have a prescription. She had pleaded no contest to one charge of child neglect, and the two remaining charges were dropped.

¶ 12 C.W. admitted the police found marijuana at her home and some paraphernalia in the drawer of a table in her living room. She claimed she had lied when she told police it was hers and that it really belonged to a young man who had resided in a downstairs garage area which had been converted into a bedroom. The young man previously had helped them out financially. He had since had moved out.[3] C.W. made the claim regarding the drugs because the police had been in her house four or five times when her husband was alone there, she "didn't want them to harass him." She claimed ownership of the marijuana "[s]o they would leave my husband alone." She described having a controversy with a Nicoma Park police officer because of involvement in a situation in which she had testified against a particular police officer and in support of the police department's chief of police and a lieutenant. C.W. claimed the police had called her a liar

when she reported experiencing a burglary, and she accused a relative of slashing her tires. She described how part of her family turned against her because she had become the Wards' guardian. She also thought the foster parents and the Nicoma Park police were coaching the children.

¶ 13 C.W. stated she was aware police had found 15 Lortab, 18 Xanax, 1 Oxycontin, 2 Dolopine, 1 Ambien, and 11 Valium pills in a coffee table drawer in her living room. She had told the Wards they were not allowed in the table and only later found out she should have locked up the medications. She acquired a safe box for this purpose after the Wards were removed from the home and after she had a burglary in which her prescriptions, I.D., purse, food stamps, and some money were taken.

¶ 14 After the Wards were removed from Guardians' home and they were adjudicated as deprived, C.W. requested an Individual Service Plan (ISP) through DHS. Under that ISP[4] she agreed to several things, among which was drug testing. C.W. stated she tested positive for marijuana in June of 2009 because her daughter's husband "put something in my coffee," she speculated that her creatinine levels were probably high during another test because she had consumed medication for an extended bad head cold, and she admitted to testing positive for barbituate because she took a pill that wasn't hers to treat a headache under the mistaken belief it was like her own prescribed medication.

¶ 15 C.W. offered an explanation about a time during an observed visit after one of the classes she attended under the terms of her ISP. One of the Wards found a pill in a bag of gifts and turned it in to an adult. It was the result of a simple accident—she had dropped one of R.W.'s headache medications

---

3. While the Wards lived with Guardians, they also housed a woman and her daughter for what was supposed to last a week but became a month. C.W. "kicked her out" a week before the police came to the home. The precise amount of time is not clarified. The Wards' mother lived with Guardians for about a year, moving in after the Wards were removed and her husband went to prison.

4. At the time of this ISP, the Wards' mother had not completed the terms of a deferred sentence imposed after she pleaded guilty to one count of attempting to obtain a controlled substance by fraud, their stepfather was incarcerated under a six-year sentence imposed in August of 2009 following conviction for burglary and concealing stolen property, and their father had a felony conviction in August of 2010 for assault and battery with a dangerous weapon and was serving a 12–year sentence.

and it ended up in the bag. After that incident, she was only allowed supervised visitation with the Wards. She claimed the DHS caseworker advised her she could not go out into her backyard if the Wards were present in an adjoining yard.

¶ 16 The last time C.W. visited the Wards was in May of 2011 and the last time she telephoned them was "about two months" before the hearings in February of 2012. When asked if she thought it would be "less stressful" for the Wards if she "wasn't essentially involved in their life in any way, she replied, "[u]ntil things had straightened out, yes." C.W. described how she and R.W. had improved their home since the Wards had been removed. C.W. claimed all the changes she had made in her life and her home were done to "get the kids back."

¶ 17 Rory Koon (Koon), a DHS permanency planner had been on the Wards' case since June of 2009 and had developed C.W.'s ISP after the Wards were adjudicated deprived. When hearings resumed in February of 2012, Koon reported C.W. had not made progress on her ISP since the July 1, 2011 hearing and of the 59 random drug tests, 19 were either positive or deemed positive for her failure to test. Barbituates and amphetamines were drugs for which she tested positive. He had not returned to the Guardians' home since June of 2011 because C.W. told him not to "because of the legal case." He was not aware of any visits by C.W. with the Wards since the hearing in July of 2011. He stated that due to C.W.'s criminal charges, DHS guidelines would not allow the Wards to be returned to her.

¶ 18 A CASA volunteer, Pamela Lane (Lane), stated that she went to C.W. and R.W.'s home once in September or early October of 2011. Lane stated she did not proceed into the house beyond the living room and that the home smelled strongly of cigarettes and pet excrement. She also observed pests crawling on the walls. She noted C.W. did not inquire about the Wards during her visit. R.W. appeared to be either ill or unable to talk.

¶ 19 Witness Melva Lacrecia Allen, has a mutual grandchild with Guardians from a relationship between their step-daughter and her own deceased son. Asked how often she has visited at Guardians' home, she replied "too many times to count." Allen stated Guardians' home was significantly changed by the recent remodeling, she did not notice any strong odor of cigarette smoke, she never saw any drugs or loose pills lying about, and she had not seen any type of insect infestation, such as roaches or silverfish.

¶ 20 Witness David Karbin, the boyfriend of one of C.W. and R.W.'s daughters, did the remodeling at C.W. and R.W.'s home. He began renovations in April of 2010 and completed work in October of 2011. During that time he worked on a ceiling, installed sheetrock, painted and textured, made small electrical repairs, did framing, added doors to newly framed areas, sanded floors, did trim work, stained, and installed tile. He also planted grass outside the home. During his work at the house, he did not observe a pest problem. He is bothered by smoking, is a non-smoker, and did not experience any problems from smoking odors. He lived at the home while he was doing the renovations.

¶ 21 By the time of hearings in 2012, the Wards had lived with foster parent Tamara Ferrell (Ferrell)[5] for nearly three years. Initially, Ferrell assumed her foster status would last for about six months. Ferrell, who is Guardians' niece (and the Wards' first cousin, once removed), lived next door to Guardians for three or four months on one side of them, and then in a house on the other side. In August of 2010 she moved with the Wards to another location.

¶ 22 C.W. did not visit the children for a few months after the Wards were placed with Ferrell. While she lived next door, four to six months would pass between C.W.'s visits with the Wards, and only one visit occurred in Ferrell's home. C.W. called the Wards on the telephone "[m]aybe once a month" during that time period. After consulting with Koon, she allowed the Wards to

**5.** Her husband, John Ferrell, also is a foster parent for the Wards. He was not called as a witness at the hearings.

go on one unsupervised visit with their mother in September 2010 for a party for one of the Wards' birthdays, and C.W. saw the Wards at that gathering.

¶ 23 In the year and a half since Ferrell had moved away from next door, C.W. visited two times, the last time on May 7, 2011. At the May, 2011 visit, the Wards received their 2010 Christmas presents from C.W. and the Wards' mother also visited. The visit lasted from about 3:30 or 4:00 until 8:00, it was conducted outside Ferrell's home, and she watched over it through a window. She heard C.W. and the Wards' mother come into the house, going into the Wards' "rooms and things," at least three times. After the May, 2011 visit, Koon told her C.W. had called and complained of being forced to stay outside in hot weather. Ferrell denied it was hot or that she "made them stay outside and would not let them come in our house." As a consequence of these alleged statements, Ferrell's husband let it be known he "really didn't want [C.W.] back on any of his properties" after the visit in May of 2011.

¶ 24 The last time C.W. called the Wards on the telephone at Ferrell's was in November of 2011. During most of the last six months of telephone contacts by the Wards with C.W., Ferrell monitored the calls by using a speaker phone. The Wards also had private telephone conversations with C.W. They had complained to Ferrell that C.W. made them feel bad during the conversations. She gave as an example comments by C.W. about how her dog missed them and about how she had a puppy they should play with. C.W. did not contact the Wards for Christmas of 2011, one of the Wards' December, 2011 birthdays, or for another Wards' February, 2012 birthday. Since May of 2011, Ferrell denied refusing any request by C.W. for visitation. She had told C.W. that she could not arrange visitation on a particular day and had asked that she be given more notice than a call the night before. The Wards never asked to visit C.W., telephone her, or send her any cards. The Wards had told her they would run away if returned to C.W. Ferrell thought such placement could be dangerous because when the Wards were there previously, "[n]obody really supervised them." She had not been in Guardians' home for "at least two years" prior to the hearings in February, 2012, and did not know about any improvements.

¶ 25 The Wards all testified. The eldest, age 11, wanted to stay with the Ferrells and did not want to return to C.W. The middle child, age 8, did not want to return to C.W.'s home "[b]ecause she has cockroaches" and she had seen C.W. sell drugs. She saw C.W. give pill bottles to people she did not know and the people give C.W. money. She gets spanked at both C.W.'s and at the Ferrells, but only if she lies at the Ferrell's. The youngest, age 7, explained that when he was in trouble at the Ferrell's he was grounded. Asked about when he lived with C.W., he remembered "some of it." He didn't want to return to C.W.'s because of cockroaches and spiders and wanted to stay with Ferrell.[6]

¶ 26 In a February 24, 2012 Journal Entry, after noting R.W. had stipulated he was "physically and medically incapable of performing his duties as guardian of the three minor children," the trial court removed him as guardian pursuant to § 4–801. The trial court removed C.W. as a guardian of the Wards pursuant to this same statutory authority "for abuse of her fiduciary responsibility and continued failure to perform her duties and because it is no longer proper that the children should be under guardianship."

¶ 27 The trial court found C.W. had failed to insure that her home was safe[7] and appropriate for the Wards, the Wards had been in the custody of the State of Oklahoma since June 6, 2009, she had not visited them since May of 2011, her home lacked running water as of February 15, 2012, she last had telephonic contact with the Wards in November of 2011, and she had no contact with the

---

6. Although the Legislature has provided for participation of incapacitated or partially incapacitated persons in decision-making with general and limited guardians, *see* 30 O.S.2001 § 1–103(B)(2), these provisions do not also reference minors.

7. As to the lack of safety, the trial court also found C.W. had failed to protect the Wards from exposure to the use of illegal drugs.

Wards for Christmas of 2011 or for the two children's birthdays which occurred in December of 2011 and February of 2012.

### ANALYSIS

¶ 28 Pursuant to 30 O.S.2001 § 1–114(B)(1) the court has the power to "[a]ppoint and remove guardians for minors," and, pursuant to 30 O.S.2001 § 1–114(B)(7), to "make or modify any temporary order of guardianship" of a minor. Section 4–801 of Title 30, effective since 1988, provides:

A guardian may be removed by the district court for any of the following causes:

1. For abuse of his fiduciary responsibility.

2. For continued failure to perform his duties.

3. For incapacity to perform his duties.

4. For gross immorality.

5. For having an interest adverse to the faithful performance of his duties.

6. If the instrument in which the person was nominated as guardian is judicially determined to be invalid.

7. In the case of guardian of the property, for insolvency.

8. When it is no longer proper that the ward should be under guardianship.

The trial court found C.W.'s guardianship was terminable under the causes stated in § 4–801(1), (2), and (8).

¶ 29 In her appeal, C.W. argues her guardianship should not have been terminated because she "had complied with DHS requirements" and the trial court had ignored her "proof that conditions had changed." A great deal of the testimony related to whether C.W. had made sufficient changes to meet the terms of her ISP such as might merit a return of the Wards to her custody. C.W. misconstrues the issue before the trial court. Return of the Wards to her custody was not the issue; the issue was whether C.W.'s temporary guardianship should be terminated pursuant to 30 O.S.2001 § 4–801.

¶ 30 Citing O.U.J.I. Civil Instruction 3.1, C.W. argues the "proper burden of proof in terminating a guardianship should be the greater weight of the evidence." Citing *Matter of Guardianship of M.R.S.*, 1998 OK 38, 960 P.2d 357, and *In Re Guardianship of T.R.W.*, 1985 OK 99, 722 P.2d 1197, she also argues "[t]he standard for the dissolution of a guardianship is the best interest of the child."

¶ 31 *M.R.S.* and *T.R.W.* are distinguishable. In *M.R.S.*, the Court addressed the application of 30 O.S.2011 § 4–804 [8] when a father, who had not been found unfit, sought to regain custody of his child from third parties after the condition which had caused him to agree to the guardianship no longer existed. In *T.R.W.*, a child was abused by his stepmother, and the Court addressed various issues raised by his father in parental rights termination proceedings after the child was adjudicated deprived.

¶ 32 "Guardianship and custody are separate matters. *See Ex parte Fortune*, 1936 OK 46, ¶ 0, 53 P.2d 1100, (Syllabus 2)." *In the Matter of the Guardianship of J.J.H.*, 2007 OK CIV APP 75, ¶ 23, 168 P.3d 243, 247. In *Fortune*, the Court held that, in the trial of a habeas corpus proceeding instituted by a guardian to obtain custody of his ward, the issuance of the guardianship letters did not constitute an adjudication of the right to custody and was not conclusive on the question of custody. The considerations implicated when the court addresses the right of fit parents to custody of their children under state and federal constitutions are not identical to those brought into play when considering whether a guardianship should be terminated for cause. C.W. initially was appointed as a guardian because of circumstances of the Wards' parents; she is not one of their parents. Termination of a guardianship is not the same as a termination of parental rights. Removal for cause of a guardian rests within the discretion of the Court, and

---

**8.** In § 4–804, the Legislature provided that the "[t]he guardian of an incapacitated or partially incapacitated person or minor may be discharged by the court when it appears to the court, on the application of the ward or otherwise, that the guardianship is no longer necessary."

unless that discretion is abused, its action will not be disturbed. *In re Brink's Estate,* 1925 OK 213, ¶ 0, 235 P. 539.

¶ 33 Surely, the best interest of the child is a necessary component in making a determination whether a guardianship should continue or whether it is no longer necessary and proper. The essential goal of guardianship is the protection of the health, safety and welfare of minors and incapacitated or partially incapacitated persons. It would be nonsensical to ignore a minor's best interest when making such a determination. However, it is not the only factor. As the causes listed in § 4–801 clearly indicate, the performance of the guardian *as such* is another key consideration when addressing termination for cause. For example, under these statutory provisions, one guardian may be terminated for cause and another appointed if a need remains.

¶ 34 Title 30 O.S.2001 § 1–105 provides: "A guardian is a person appointed by the court to take care of the person or property of another." On July 8, 2009, Guardians submitted a Plan for the Care and Treatment of the Ward to the trial court in which they agreed to provide the Wards with "[f]ood, clothing, shelter, schooling and doctor visits" and identified it as necessary that they "meet their daily needs." The Wards were removed from her custody, their temporary custody was placed with DHS, and they were adjudged deprived because of conditions occurring while the Wards were in C.W.'s care.

¶ 35 Section 1–111(20) of Title 30 contains the following definition:

"Neglect" means the failure to provide protection for an incapacitated person, a partially incapacitated person, or a minor who is unable to protect the person's own interest; or the failure to provide adequate shelter or clothing; or the harming or threatening with harm through action or inaction by either another individual or through the person's own action or inaction because of a lack of awareness, incompetence, or incapacity, which has resulted or may result in physical or mental injury.

¶ 36 When the Wards were removed from C.W.'s home, they were adjudicated deprived *as to her,* and their custody was placed with DHS, the trial court had sufficient grounds to find the guardianship no longer was necessary. However, it did not do so at that time. C.W. requested a service plan to regain custody of the Wards and she was afforded that opportunity. Although the ISP in the deprivation proceedings gave her a potential route to regaining *custody,* she cites no authority that it somehow endowed her with rights beyond those judicially-created under the statutes applicable to her appointment *as a guardian.*

¶ 37 Over two years had elapsed between when the Wards were adjudicated as deprived and when the trial court considered whether her appointment as a guardian for the Wards should be continued. Upon her appointment as a guardian, C.W. assumed a duty to provide for the Wards, who are all minors. She has not done so for an extended period of time nor has she maintained regular contact with them. The needs of the Wards are being met by others.

¶ 38 The record supports the findings of the trial court entered on February 24, 2012. The Wards had been in the custody of DHS since June 6, 2009, C.W. had not visited them since May of 2011, she last had telephone contact with them in November of 2011, she had failed to contact the Wards for several holidays in 2011 and 2012 (Christmas and two of the Wards' birthdays), her home lacked running water as of February 15, 2012, and she had failed to assure her home was a safe and appropriate place for the Wards.

¶ 39 The trial court did not abuse its discretion in terminating C.W.'s temporary guardianship of the Wards due to her abuse of her fiduciary duties, her continued failure to perform her duties as a guardian, and because it was no longer proper that they remain under guardianship. The judgment of the trial court is **AFFIRMED.**

BELL, P.J., and MITCHELL, J., concur.